IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES F. TAYLOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 12-841-GMS |
| | ) |
| CORRECT CARE SOLUTIONS, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

### I. INTRODUCTION

The plaintiff, James F. Taylor ("Taylor"), a prisoner housed at the James T. Vaughn Correctional Center, Smyrna, Delaware filed this lawsuit pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and was granted leave to proceed *in forma pauperis*. (D.I. 9.)

Before the court is the defendants' motion for summary judgment and Taylor's opposition thereto. (D.I. 46.)

### II. FACTUAL AND PROCEDURAL BACKGROUND

The case proceeds on the original complaint (D.I. 3) and raises medical needs claims pursuant to 42 U.S.C. § 1983 against the defendants Correct Care Solutions ("CCS"), William Mazur, M.D. ("Dr. Mazur")[1], Dale Rogers, M.D. ("Dr. Rogers"), and Angela Robinson ("Robinson").

Medical records indicate that Taylor, who has arthritis, has complained of knee pain and difficulty since at least 2006. (D.I. 47, ex. A; D.I. 52.) An MRI of the left knee performed on

---

[1] Dr. Mazur is also referred to as Azur by the defendants.

1

October 27, 2006 revealed meniscal tears and chrondromalacia.[2] (*Id.* at ex. B.) In 2007, a recommendation was made by consulting physician Dr. Dushuttle ("Dr. Dushuttle"), an orthopedic surgeon, that Taylor undergo steroidal injections as a method of delaying total knee replacement. (*Id.* at ex. C.) Taylor underwent a series of steroid injections and was also treated with medication, including Naproxen. (D.I. 52.) A November 27, 2008 consultation request for Taylor states that "based on MRI, patient will almost certainly need surgery." (*Id.*)

On June 10, 2010, site medical director Dr. Rodgers[3] signed off on a consultation request that noted failed outpatient therapies of a left knee brace and steroid injections. On June 11, 2010, Dr. MacBride approved an alternative treatment plan that included a new MRI and an orthopedic consult. (*Id.*)

CCS became the medical service provider for Delaware Department of Correction ("DOC") institutions on July 1, 2010 and provided services through June 30, 2014. *Parkell v. Danberg*, 21 F. Supp. 3d 339, 345 (D. Del. 2014).[4] On July 22, 2010, CCS medical personnel submitted an outpatient referral request for Taylor to see Dr. Dushuttle. (D.I. 54.) On July 27, 2010 Taylor was examined by medical. He complained of having difficulty ambulating and requested an assistance device such as crutches or a cane. (D.I. 47 at ex. D.) An MRI, taken on July 12, 2010, revealed degenerative and tearing of the medial meniscus and a lateral meniscal tear, with myxoid degenerative change along the anterior cruciate ligament fibers. (D.I. 54.) On August 11, 2010, Taylor was seen by Dr. Dushuttle, and he recommended a total knee

---

[2] Abnormal softening or degeneration of cartilage of the joints, especially of the knee. *The American Heritage Stedman's Medical Dictionary* 152 (2d ed. 2004).
[3] It appears that Rogers and Rodgers refer to the same person.
[4] Correctional Medical Services provided medical services to the DOC from July 1, 2005 through June 30, 2010. *Id.* at 345. The current medical service provider, Connections Community Support Programs, Inc., took over general healthcare provider responsibilities for Delaware's inmate population on July 1, 2014.
*See* http://doc.delaware.gov/.news/pdfs/14press0625.pdf (Feb. 5, 2015).

replacement. (D.I. 47, ex. D; D.I. 54.) Dr. Dushuttle also recommended and administered a cortisone injection. (D.I. 54.)

When Taylor was seen by medical on August 13, 2010, medical personnel discussed with him the consult report. (D.I. 47, ex. D.) On October 11, 2010, the consult was again discussed with Taylor, and he was told that medical was awaiting a re-evaluation by the regional medical director. (D.I. 54.) Taylor was examined by Dr. Mazur on October 21, 2010. (*Id.*) Upon examination Taylor had full range of motion, but significant pain. Taylor related that he had instability for years that had significantly worsened in recent months. (*Id.*) The instability had resulted in numerous falls and impaired his ability to work. (*Id.*) Dr. Mazur's notes refer to the recommendation of a total knee replacement by Dr. Dushuttle. In the progress notes, Dr. Mazur states that he will review the chart with the provider in detail to determine if all conservative treatment options have been utilized. (*Id.*) The progress notes indicate that the case will be discussed at a provider meeting. (*Id.*) The record does not contain evidence of medical treatment from October 21, 2010 to June 14, 2011.

Taylor states in his complaint that he met with Dr. Rogers a few months after saw Dr. Mazur. At that time, Dr. Rogers read him a letter regarding a CCS policy that surgery was not authorized unless a condition was life threatening. (D.I. 3, ¶ 3.) Dr. Rogers told Taylor that the policy came from the director's office at CCS. (*Id.*) At the time, Robinson was the director for CCS. (D.I. 56.)

Progress notes dated June 21, 2011 indicate that Taylor was receiving physical therapy for his left knee, but continued to have pain. (D.I. 54.) Taylor was issued a home exercise program and continued to wear a brace as needed for support at work. (*Id.*) Physical therapy continued through August 2011, but progress was slow, there was pain with activity, and Taylor

had problems standing for long periods. (*Id.*) As of September 2011, Taylor's range of motion had improved, but he continued to complain of left knee pain. (D.I. 47, ex. E.) Taylor worked full-time in the kitchen and was able to perform functional activity and work related duties, unrestricted, despite degenerative changes in the left knee. (*Id.*) He was discharged from physical therapy and to continue with follow-up as needed. (*Id.*) Taylor was given a wheelchair in 2012. (D.I. 53, ¶ 6.) He states that he now goes to all functions with a cane and wheelchair. (D.I. 53.)

## III. LEGAL STANDARD

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing

4

on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The defendants move for summary judgment on the grounds that Taylor: (1) failed to present evidence of an Eighth Amendment violation; (2) failed to present an expert opinion to support his constitutional claim; (3) presented limited, if any evidence, that Dr. Mazur and Robinson had any involvement in his care; and (4) presented no evidence that CCS maintained a policy or custom to deprive him of his constitutional rights. Taylor opposes the motion and argues, in essence, that the delay and denial of the recommended medical treatment constitutes deliberate indifference to a serious medical need in violation of his constitutional rights.

## IV. DISCUSSION

### A. Medical Needs

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to

state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

When a plaintiff relies upon a theory of respondeat superior to hold a corporation such as CCS liable, he must allege a policy or custom that demonstrates deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *see Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of employees of a corporate medical provider have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

6

## B. Proper Care and Personal Involvement

The defendants argue that Taylor has failed to demonstrate that they have been deliberately indifferent to his medical needs and that Taylor was provided with constant care for his left knee during the time CCS was the medical service provider. The defendants refer to diagnostic tests, medical oversight, outside orthopedic specialists, and physical therapy. They argue that Taylor challenges the type of care he has received for his knee injury, "not the traditional care" that the medical defendants have provided him.

The court views the evidence in the light most favorable to Taylor, the non-moving party. The record reflects that all individual defendants had some involvement either in the treatment provided to Taylor or in the decision-making with regard to the type of treatment he did, or did not, receive. The medical records indicate that when CCS became the medical care provider Taylor was referred to Dr. Dushuttle who recommended that Taylor undergo a total knee replacement. The recommendation was made on August 11, 2010. On October 21, 2010, Dr. Mazur indicated that he would review Taylor's chart to determine if all conservative treatment options had been utilized and that Taylor's case would be discussed at a provider meeting. The record is silent on both the outcome of Dr. Mazur's review and the provider meeting (the October 21, 2010 progress note that refers to the provider's involvement in Taylor's treatment was not provided by the defendants). Notably, there is an eight-month gap in the progress notes and there is no evidence that any medical care was provided to Taylor during that time.[5]

The defendants state that they provided traditional treatment and that Taylor merely disagrees with the type of treatment provided. The record, however, does not explain why the

---

[5] The gap is even bigger when viewing the exhibits submitted by the defendants. The defendants did not provide any records of medical treatment to Taylor between August 13, 2010 and September 13, 2011. (*See* D.I. 47, exs. D, E.)

7

defendants did not act on Dr. Dushuttle's recommendation of a total knee replacement, there is no evidence in the record that the surgery did not take place due to medical reasons, and the record fails to explain why delays occurred in treatment. It is clearly established that Taylor has the constitutional right to be free from unnecessary and wanton infliction of pain resulting from a delay in the provision of adequate medical care. *See Estelle*. Here, the record is replete with Taylor's continuing complaints of pain and his difficulty with ambulation. Finally, the defendants posit that reasonable treatment was provided to Taylor but, according to Taylor, he now requires a wheelchair.

At this juncture, there remain issues of fact with regard to the whether the defendants were deliberately indifferent to Taylor's medical needs. For the above reasons, the court will deny the defendants' motion for summary judgment.

C.     **Expert Testimony**

The defendants contend that summary judgment is appropriate because Taylor failed to present expert testimony to support his claim, and his claim is not apparent to a layperson. Taylor responds that Dr. Dushuttle is an expert in orthopedic surgery and his professional opinion, prognosis, diagnosis, and testimony will be important to show Taylor has severe damages. (D.I. 56.) "Where the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts, the jury itself is allowed to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 579 (3d Cir. 2003) (citations omitted). The factual predicate for a common knowledge case is one where "the

carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." *Id.*

Here, Taylor has not identified an expert witness. However, in the event this matter goes to trial, it appears that Taylor will call Dr. Dushuttle as a fact witness to support his claim. Accordingly, the court will deny the defendants' motion for summary judgment on the issue of expert testimony.

### D. Corporate Defendant

The defendants move for summary judgment on behalf of CCS on the grounds that Taylor has failed to present any proof to even suggest that CCS maintained a policy or custom to deprive him or his constitutional rights. As discussed, CCS may be liable under § 1983 if it adopted a policy or custom that deprived Taylor of his constitutional rights. There are "three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983," as follows: (1) where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself; and (3) where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need. *Natale*, 318 F.3d at 584 (internal quotations and citations omitted).

Taylor refers to a specific policy of CCS – that it does not authorize surgery unless the matter is life threatening. To date, the recommended surgery has not taken place. In addition, there may be a constitutional violation under the deliberate indifference standard when medical care is delayed for non-medical reasons. Dr. Mazur indicated that he would review Taylor's chart to determine if all conservative treatment options had been utilized and that Taylor's case would be discussed at a provider meeting. As previously noted, the record is silent as to the outcome of the provider meeting, the outcome of Dr. Mazur's review, and the reason for what appears to be an eight-month delay in treatment.

There is evidence in the record that CCS was aware of Taylor's medical needs. An inference can reasonably be drawn that CCS knew that the failure to authorize medically recommended treatment created a serious risk of harm. Under these circumstances, there is an issue of fact as to whether policymakers at CCS knew of Taylor's serious medical need and ignored it. Therefore, the court will deny the defendants' motion for summary judgment as to CCS.

## V.  CONCLUSION

For the above reasons, the court will deny the defendants' motion for summary judgment. (D.I. 46.) The court will also refer representation of Taylor to a member of the Federal Civil Panel.

An appropriate order will be issued.

_Feb 10_, 2015
Wilmington, Delaware

_____
UNITED STATES DISTRICT JUDGE

10